UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                          Bankruptcy No.  10-30655

Todd James Freese,                                              Chapter 7

                              Debtor.
_____/

Terrance Paul Aslakson,
individually and derivatively on behalf of
North Country Auto Brokers, LLP,

                    Plaintiff,

          vs.                                                   Adversary No.  10-7021

Todd James Freese,

                    Defendant.
_____/

## MEMORANDUM AND ORDER

I.      **INTRODUCTION**

        A.      **Procedural Background**

        By Complaint filed August 19, 2010, Plaintiff Terrance Paul Aslakson, individually

and derivatively on behalf of North Country Auto Brokers, LLP, initiated this adversary

proceeding seeking a determination that Debtor/Defendant Todd James Freese's

obligation to Aslakson is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and (4).

Aslakson also pled a cause of action under 11 U.S.C. § 727.  Debtor filed an Answer on

September 7, 2010, denying the allegations.  The matter was tried on September 27,

2011.

1

Prior to the presentation of evidence at trial, Aslakson abandoned his section 727 claim. At the close of evidence, Aslakson also abandoned his section 523(a)(4) claim to the extent he pled a cause of action alleging that the debt owed to Aslakson was not dischargeable because it resulted from embezzlement or larceny. Consequently, the only causes of action before this Court are Aslakson's claim under section 523(a)(2)(A), asserting that the debt to Aslakson is not dischargeable because it was obtained by false pretenses, false representations or actual fraud; and his claim under section 523(a)(4), alleging that the debt to Aslakson is not dischargeable because it resulted from fraud or defalcation while acting in a fiduciary capacity.

### B.    Motion to Admit Evidence

Two weeks after trial, Aslakson filed a Motion to Admit Evidence, arguing his failure to offer Plaintiff's Exhibit 10 at trial was an oversight. Plaintiff's Exhibit 10 includes contracts of sale from North Country Auto Brokers and bills of sale from Tri-State Auto Auction-Fargo. At trial, Debtor identified these documents and Aslakson questioned Debtor about information included in these documents. Debtor did not file a response to Aslakson's motion. Because proper foundation for the receipt of these documents was offered at trial and the Court received no objection to the admissibility of this evidence, Aslakson's motion is **GRANTED**. Plaintiff's Exhibit 10 is **RECEIVED** into evidence.

2

II.    **FINDINGS OF FACT**

In December 2001, Aslakson and Debtor, who was married to Aslakson's

stepdaughter at the time,[1] formed a North Dakota limited liability partnership for the

purpose of owning, holding, managing, leasing and selling pre-owned vehicles.

Although Aslakson had no experience selling used cars, he agreed to form a

partnership with Debtor because Debtor was unemployed and Aslakson wanted to help

him start a business.  The name of the partnership and the business formed by it was

North Country Auto Brokers, LLP (NCAB).

Aslakson and Debtor executed a Partnership Agreement on December 21, 2001,

appointing Debtor the Managing Partner of NCAB.  Under the Partnership Agreement,

the Managing Partner handled the day-to-day affairs of the partnership and provided

such services to the operation of the partnership's business as he deemed "proper and

necessary."  Pl.'s Exh. 1 at ¶¶ 8b, 10.  The Partnership Agreement required the

Managing Partner to keep and maintain complete records of each and every transaction

of the partnership and deposit the funds of the partnership in a designated bank

account.  Pl.'s Exh. 1 at ¶¶ 8c, 8d.  Other responsibilities were left to the discretion of

the Managing Partner.  The Partnership Agreement granted the Managing Partner a

great deal of discretion and gave him the benefit of the doubt regarding the exercise of

this discretion.  The agreement provided:

> The Managing Partner shall not be liable to the Partnership or to any Partner
> for any mistake, error in judgment, act or omission believed in good faith to
> be within the scope of authority conferred by this Agreement.  The Managing

---

[1] Debtor and Aslakson's stepdaughter divorced in 2006.

3

Partner shall be liable only for acts or omissions involving intentional wrongdoing.

Pl.'s Exh. 1 at ¶ 8e.  As compensation for these services performed for the partnership, the Managing Partner was guaranteed a salary of $3,000 per month.  Pl.'s Exh. 1 at ¶ 8.

Consistent with the Partnership Agreement, Debtor assumed responsibility for all functions and operations of NCAB.  Aslakson's role in the business was to provide collateral for the loans to NCAB.  He also provided a location for NCAB, allowing it to operate from the same property as Aslakson's trucking company.  Other than occasionally repairing vehicles NCAB offered for sale or lease, Aslakson did not have any direct involvement in the business after it was formed, leaving the day-to-day operations to Debtor, who was employed in the car business for fifteen to twenty years prior to forming a partnership with Aslakson.

To fund operating capital used to pay business expenses, including the purchase of vehicles NCAB offered for sale, NCAB borrowed money from Community Bank of the Red River Valley, now known as Frandsen Bank and Trust (Frandsen Bank).  The loans included an operational line of credit, a "floor plan" loan and a third loan for approximately $5,500.00 to pay business debt.

The first loan from Frandsen Bank to NCAB was a $100,000.00 revolving line of credit secured, at least in part, by personal guaranties from both Aslakson and Debtor. After two or three years, the operating loan was depleted because NCAB was not a profitable business.  In 2004, Aslakson and Debtor decided to continue with the business and made arrangements to borrow additional money.  Frandsen Bank extended NCAB a $75,000.00 "floor plan" line of credit to purchase cars for sale by the

4

partnership.  To secure the line of credit, Aslakson offered additional collateral and both

Aslakson and Debtor provided a personal guaranty to the bank.  In addition, NCAB

granted Frandsen Bank a security interest in the vehicles acquired with proceeds from

the floor plan line of credit.  Frandsen Bank kept an inventory of vehicles.

    According to Aslakson, Frandsen Bank held titles to the vehicles purchased with

the floor plan line of credit until it received proceeds from the sale of a specific vehicle,

at which time it would release the title to the vehicle sold.[2]  Based on this testimony, it

appears that Aslakson assumed that the bank and/or Debtor routinely reconciled the

inventory list with the sale documentation to ensure that the proceeds from every NCAB

sale were applied to the debt owed against the vehicle.  Aslakson maintained he would

not have agreed to enter into an agreement to borrow money under the floor plan line of

credit or offer collateral for this line of credit had he known that the proceeds from the

sale of the vehicles would not be promptly applied to the loan as expected.

    Debtor testified that the floor plan line of credit did not require that NCAB notify

the bank and remit the proceeds from each sale of a vehicle immediately after sale of a

vehicle listed on the floor plan inventory.  However, Debtor offered no detail or

documentation regarding any grace period to notify the bank or pay off the debt against

the vehicle purchased with funds from the line of credit.

    The Parties stipulated that NCAB was never profitable.  Financial statements

prepared by NCAB's accountant, Clarence V. Vetter, show a bleak financial picture.

---

[2] Aslakson did not offer loan documentation in support of this understanding.
None of the loan documents and security agreements between Frandsen Bank and
NCAB were offered as evidence at trial.

|      | Net Income/Loss | Total Stockholders' Equity |
|------|-----------------|----------------------------|
| 2002 | ($38,162.04)    | ($40,914.92)               |
| 2003 | ($43,899.11)    | ($84,814.03)               |
| 2004 | ($20,411.12)    | ($105,225.15)              |
| 2005 | $243.29         | ($104,981.86)              |
| 2006 | ($69,751.01)    | ($163,113.63)              |

Pl.'s Exh. 5, 6, 7, 8.[3] Vetter explained that while he used generally accepted accounting procedures to prepare these financial statements, NCAB did not apply generally accepted accounting procedures in its business. In support of this testimony, Vetter noted that NCAB's accounts were used by Debtor to pay personal expenses, such as rent, child support and liquor. Vetter also clarified that the financial statements did not reflect payments from Aslakson's personal account that were made on behalf of NCAB. Vetter explained that, if these sums had been included in the financial analysis, NCAB's losses would have been greater.

Aslakson acknowledged that he knew the business was not profitable after the first year it was in business. Other than a dividend after the first six months of operating, all the information provided to Aslakson indicated that NCAB was losing money.

The information Aslakson received included business plans for NCAB, which Debtor prepared every year and provided to Aslakson. Aslakson also received financial

---

[3] Vetter prepared the 2005 and 2006 financial statements some time after NCAB stopped doing business. He could not recall if Debtor or Aslakson gave him the numbers used in the 2005 and 2006 financial statements and could not confirm whether they were accurate.

statements prepared by Vetter, which were based on information Vetter received from Debtor.  The financial statements included figures reflecting the value of inventory maintained by NCAB.[4]

Aslakson also received information from Debtor regarding the status of NCAB's sales.[5]  Because Aslakson's trucking business was located at the same place as NCAB, Aslakson and Debtor saw each other on almost a daily basis, and the men regularly discussed how the business was doing and whether business was good or slow.

In deciding whether to allow the business to continue operating despite its losses, Aslakson relied on Debtor's reports and the financial statements prepared by Vetter.  Aslakson's access to the NCAB financial information and business records was not restricted; he simply relied on the information he received from Debtor.[6]

Despite receipt of financial statements showing business losses for 2002, 2003 and 2004, Aslakson testified that the first sign of serious business trouble came in 2005.

---

[4] Vetter testified that the figures he used for the 2002-2004 inventory balance generally came from Debtor.  Sometimes Debtor would provide a floor plan inventory, sometimes Debtor would simply provide an inventory value for Vetter to use in preparing the financial statements.  As noted above, the financial statements for 2005 and 2006, which included inventory balances, were not prepared until after the partnership was terminated.

[5] Aslakson admitted that he did not know when NCAB vehicles were sold or whether there was a profit from each sale, but he assumed that the vehicles sold for more than the debt owed against them.  He also acknowledged that NCAB incurred expenses other than the cost to purchase the vehicles, such as insurance, rent and vehicle transportation, but suggested that some of the profit may have gone to pay Debtor's salary.  However, during cross examination, he conceded he had no evidence that profits found their way to Debtor's pocket.

[6] In his testimony, Debtor suggested that Aslakson looked at the books and reviewed financial statements from time to time.

During a partnership meeting in November 2005, Aslakson learned that NCAB did not have funds sufficient to make the interest payment to Frandsen Bank.  At this meeting, Debtor provided Aslakson a business plan he had prepared for NCAB on August 31, 2005.  See Pl.'s Exh. 4.[7]  In the plan, Debtor represented that interest on the credit line floor plan and insurance payments were current, but he was not able to reduce the credit line debt of $100,000 because of "personal issues."  Id.  To address his goal of reducing NCAB's business debt, Debtor stated he would not draw a salary from NCAB from November 2005 to February 2006, the time of year when sales are slow.[8]  Id.  From March 2006 to October 2006, Debtor planned to make payments of $500/month toward the credit line.  He also planned to apply $100 per vehicle sold to the debt owed by NCAB.  Id.  Debtor reported that NCAB realized no financial losses from January to August 2005, and expressed optimism regarding the future success of the business.  Id.

Relying on earlier business plans prepared by Debtor and Debtor's representations in the August 2005 business plan that he would make future loan payments and refrain from taking a salary for the months of November 2005 through February 2006, Aslakson agreed not to terminate the partnership immediately.[9]  He also

---

[7] Debtor claims he did not know if the business was delinquent on the Frandsen Bank loans in August 2005 when he prepared the business plan, but he conceded that he put a positive spin on the business outlook to entice people to continue doing business with NCAB.  He testified he did not create the business plan with the intent to defraud, and that he prepared it with the best of his knowledge.

[8] Debtor found part-time employment as a bartender, which he assumed would provide sufficient income to take care of personal needs from November 2005 through February 2006.

[9] The Partnership Agreement granted any partner holding 50% or more of partnership interests the right to vote to terminate and dissolve the partnership.  Pl.'s

agreed to provide more financial support to NCAB.  On November 12, 2005, Aslakson

paid NCAB's interest payment of over $8,000.00 with funds from a personal account.

However, Aslakson advised Debtor he would not agree to pay any more of NCAB's debt

with money "out of his own pocket."  He also told Debtor that if Debtor could not make a

living from NCAB, the partnership would have to close the business.

Although Debtor did not take a full salary from November 2005 to February 2006

as planned, he withdrew cash and paid personal expenses from NCAB's checking

account.[10]

In August 2006, Aslakson received a telephone call from Frandsen Bank

Representative Jack Robertson.  Robertson indicated that there was a problem with

NCAB's inventory.  Aslakson met with Robertson at the bank to discuss the status of

NCAB's inventory.  Robertson reportedly told Aslakson that he reviewed the NCAB

inventory list with Debtor over the phone and Debtor informed Robertson of the status

or location of each vehicle on the inventory list.  According to Aslakson, Robertson

recorded Debtor's comments about the location of the vehicles with handwritten notes

on an NCAB inventory list dated July 3, 2006.[11]  Robertson advised Aslakson that a

---

Exh. 1 at  ¶ 14.  Aslakson and Debtor each owned 50% of the partnership interests.

[10] As noted above, Vetter testified that Debtor paid personal expenses with funds
from NCAB's business checking account, including rent, child support and liquor.
Copies of checks received as evidence at trial confirm this testimony, and show that
Debtor routinely wrote checks to himself for $30-$100, with no apparent business
purpose for doing so.

[11] The NCAB inventory list dated July 3, 2006 was marked as Plaintiff's Exhibit 2
and received into evidence without objection.

9

bank representative tried to find each of the 32 or 33 vehicles on NCAB inventory list and located only five.

After meeting with Robertson, Aslakson called Debtor to tell him about his conversation with Robertson and to ask Debtor about the NCAB inventory list.  A short time after the telephone call, the two men met at Debtor's apartment to discuss NCAB's inventory.  During this conversation, which Aslakson maintains took place in August 2006, Debtor admitted that he had been selling vehicles without remitting the proceeds from these sales to the bank, and that there were only ten vehicles on the July 2006 inventory list that had not been sold.  Debtor conceded that, as early as August 2005, he sold vehicles without reporting the sales to the bank, also referred to as "selling vehicles off the floor plan."

Aslakson maintains that the first time he learned that Debtor was selling vehicles off the floor plan was during the August 2006 conversations with Robertson and Debtor.  Aslakson testified that he would have exercised his right to terminate the business earlier had he known Debtor was selling vehicles off the floor plan and the business was "upside down."

In conflicting testimony, Debtor claims that he notified Aslakson that he had been selling cars off the floor plan in the spring of 2006.  Specifically, Debtor testified he called Aslakson in April 2006 to arrange a meeting, and the two men met to discuss the status of NCAB's inventory.  According to Debtor, at this meeting, he told Aslakson that NCAB was behind on payments to the bank for cars sold.

Sometime after Aslakson's conversations with Robertson and Debtor about the NCAB inventory, Debtor, Aslakson and a Frandsen Bank representative met to review

10

the status of NCAB's inventory.  During this meeting, which presumably took place on or

after August 23, 2006, the bank representative produced an updated NCAB inventory

list.[12]  The bank representative asked Debtor about each vehicle on the list and made

handwritten notes on the inventory list indicating the location of the vehicles or noting

they had been sold as reported by Debtor.  Debtor informed the bank representative

and Aslakson that most of the vehicles on the list were sold.  He also indicated three of

the vehicles on the list were at the repair shop, but the repair shop refused to release

the vehicles until NCAB paid $8,000.00 or $9,000.00 for work completed on the

vehicles.  Aslakson testified that Debtor confessed to the bank that he had been selling

vehicles without immediately advising the bank of the sales since the fall of 2005.

Debtor does not dispute that he sold vehicles off the floor plan beginning in the

fall of 2005.  Debtor's admissions, Aslakson's testimony and a comparison of the NCAB

inventory lists for July and August 2006 with invoices and bills of sale received into

evidence confirm this fact.  See Pl.'s Exh. 2, 3 & 10.  Debtor claims, however, that he

did not make any representations with intent to defraud.  He testified that he had

exhausted all of his efforts and there were too many expenses for the business to

continue.

NCAB ceased its business operations in August 2006, leaving considerable loan

obligations due and owing to Frandsen Bank.  Aslakson claimed that NCAB lost

approximately $60,000.00-$70,000.00 by the end of 2005, and the loss would have

been higher if Aslakson had not been making payments out of his own pocket.

---

[12] The inventory list, which was marked as Plaintiff's Exhibit 3 and received into
evidence without objection, was dated August 23, 2006.

11

Aslakson and Debtor signed a third promissory note for $5,500.00 sometime after NCAB ceased business in 2006 because the bank informed Aslakson it was part of the business debt.  The floor plan loan was restructured in 2007.  According to Aslakson, Debtor represented that he was going to make the loan payments on the restructured debt.  Debtor made approximately three payments, refinancing his motorcycle three times to make these payments.

Frandsen Bank subsequently enforced the personal guaranty against Aslakson.  Aslakson has been making payments toward the NCAB loan obligations.  Aslakson testified he personally paid $140,000.00 on the loans and the balance remaining is approximately $122,000.00.

Debtor petitioned for relief under Chapter 7 of the Bankruptcy Code on May 28, 2010.

## II.   CONCLUSIONS OF LAW

The statutory exceptions to discharge in bankruptcy are narrowly construed against the creditor to effectuate the fresh start policy of the Bankruptcy Code.  Owens v. Miller (In re Miller), 276 F.3d 424, 429 (8th Cir. 2002).  Accordingly, a creditor opposing discharge of a debt carries the burden of proving the debt falls within an exception to discharge.  Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curium).  Preponderance of the evidence is the standard of proof that applies to discharge exceptions under 11 U.S.C. § 523(a).  Grogan v. Garner, 498 U.S. 279, 286-87 (1991); Simek v. Erdman (In re Erdman), 236 B.R. 904, 911 (Bankr. D.N.D. 1999).  Where an objecting creditor fails to establish every element under section 523(a), the indebtedness at issue is dischargeable.  Id.

12

In his closing statement, Aslakson argued that Debtor should be held liable for the net losses incurred by NCAB as a result of Debtor's alleged fraud. Specifically, Aslakson claims that if Debtor had not concealed the fact that he was selling cars off the floor plan, Aslakson would have terminated the partnership and stopped NCAB from losing more money. In the alternative, Aslakson argues Debtor should be held liable for the reduction of stockholder's equity that allegedly resulted from Debtor's fraud. Aslakson alleges that this liability should be excepted from discharge under section 523(a)(2)(A) and (a)(4).

### A.    11 U.S.C. § 523(a)(2)(A)

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). To meet his burden of proving that Debtor is not entitled to a discharge of a debt owed to him, Aslakson must make a threshold showing that the debt was "obtained by" false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). If this threshold showing is made, Aslakson must then prove each of the following elements to establish nondischargeability of a debt under section 523(a)(2)(A):

1.    the debtor made a false representation;

2.    at the time the representation was made, the debtor knew it was false;

3.    the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor at the time he made the representation;

13

4.      the creditor justifiably relied on the representation; and

5.      the creditor sustained the alleged loss as the proximate result of the

representation.

Marcusen v. Glen (In re Glen), 427 B.R. 488, 492 (B.A.P. 8th Cir. 2010); Blue Skies, Inc.

v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007); Burt v. Maurer (In re

Maurer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000).

Aslakson did not offer evidence sufficient to establish the threshold showing that

the debt at issue was "obtained by" fraud.  To sustain a claim that money or property

was "obtained by" fraud under section 523(a)(2)(A), Aslakson must show that the

alleged fraudulent conduct occurred at the inception of the debt, i.e., Debtor committed

a fraudulent act to induce Aslakson to part with his money, property or services.  Valley

Mem'l Homes v.  Hrabik (In re Hrabik), 330 B.R. 765, 772 (Bankr. D.N.D. 2005);

Burbank v. Capelli (In re Capelli), 261 B.R. 81, 88-89 (Bankr. D. Conn. 2001).  Stated

another way, Aslakson must show that the alleged fraud "existed at the time of, and has

been the methodology by which, the money, property or services were obtained."

Wilcoxon Constr., Inc. v. Woodall (In re Woodall), 177 B.R. 517, 523 (Bankr. D.

Md.1995).  Misrepresentations made subsequent to the creation of the debt "have no

effect upon the dischargeability of a debt, since the false representation could not have

been the creditor's reason for the extension of credit."  In re Woodall, 177 B.R. at 524

(citation and internal quotation marks omitted); In re Capelli, 261 B.R. at 88; Fetty v. DL

Carlson Enters., Inc., dba Cottman Transmission (In re Carlson), 426 B.R. 840, 857

(Bankr. D. Idaho 2010).

14

Although he characterized it differently, Aslakson is seeking contribution from Debtor for the sum of money Aslakson paid, and is still obligated to pay, to Frandsen Bank to satisfy NCAB's debt.  Aslakson's personal obligation to pay Frandsen Bank arose from loan guaranties he executed.  There is no evidence that loans from Frandsen Bank to NCAB were obtained by fraud.  There is also no evidence that Aslakson was induced by fraud to sign the guaranties.  Rather, the evidence shows that Aslakson and Debtor both knowingly and voluntarily co-signed loans on behalf of NCAB and both knowingly and voluntarily signed guaranties securing the loans from Frandsen Bank.  The conduct Aslakson claims is fraudulent--Debtor's failure to disclose that he was selling vehicles off the floor plan--did not occur until the fall of 2005, several years after the first loan from Frandsen Bank and approximately one year after Frandsen Bank extended NCAB a $75,000.00 "floor plan" line of credit.  The third loan for $5,500.00 was after Aslakson learned about the alleged fraudulent omission. Accordingly, the Court finds that the alleged fraudulent omissions did not incur at the inception of the debt and did not induce Aslakson to sign the garanties.

Aslakson argues that from August 2005 (when Debtor began selling vehicles off the floor plan without advising Aslakson of this business decision) to December 2006 (when NCAB stopped doing business), the partnership steadily lost more funds resulting in less money available to pay the debt to Frandsen Bank.  Aslakson claims that Debtor's failure to advise him of these growing losses and the depletion of the inventory was an omission which "created debt" from the inception thereby meeting the definition of "obtained by."  Debtor cites no law in support of this proposition.  However, there is law contrary to it.  See Marcusen v. Glen (In re Glen), 639 F.3d 530, 532-33 (8th Cir.

15

2011) (finding that to meet their burden under section 523(a)(2)(A) creditors were required to show that debtors obtained money or property concurrent with debtors' misrepresentations; debtors' concealment of mortgages debtor granted to third parties which reduced the creditors' equity in the same property was not sufficient to satisfy this burden because debtors obtained financing from the creditors before the fraud took place, not as a result of the alleged fraud); Samuel J. Temperato Revocable Trust v. Unterreiner (In re Unterreiner), 459 B.R. 725, 730 (B.A.P. 8th Cir. 2011) (finding that creditor failed to meet its burden under section 523(a)(2) because the creditor's debt stemmed from a guaranty which was dated years before the alleged misrepresentations took place and not as a result of the misrepresentations); In re Juve, 455 B.R. at 894-896 (finding that debtor did not have a duty to tell the creditors that equity in assets was decreasing, resulting in debtor's inability to repay the creditors' investment).

Further, there is insufficient evidence to show that Debtor was the person who obtained the loan funds from Frandsen Bank, the repayment of which serves as the basis for Aslakson's section 523(a)(2)(A) claim.  To satisfy the threshold showing under section 523(a)(2)(A), Aslakson must show Debtor fraudulently obtained something from him, not simply that Debtor engaged in fraud that results in a debt owed to Aslakson.  In re Glen, 639 F.3d at 533 (citing cases standing for the proposition that debtor himself must have obtained money or property from the creditor and that "obtaining" money or property has one meaning: the direct transfer of money from a creditor to the debtor); Heide v. Juve (In re Juve), 455 B.R. 890, 894-896 (B.A.P. 8th Cir. 2011) (finding that the undisputed facts were not sufficient to show the debtor obtained funds by fraud; financing arrangement that served as the basis for the debt the creditor sought to

16

except from discharge was made with a corporation in which the debtor owned shares, not with the debtor individually); In re Unterreiner, 459 B.R. at 730 ("[T]he creditor is required to prove that the debtors obtained money, property, services or an extension, renewal or refinancing of credit from it at the time of the misrepresentation.") (citations omitted)); Nunnery v. Rountree (In re Rountree), 478 F.3d 215, 222 (4th Cir. 2007) (holding that section 523(a)(2)(A) requires that a debtor fraudulently obtain money, property, services or credit from the creditor; a debt arising from fraud that results in a debt to the creditor without evidence that the debtor obtained something is not sufficient to meet this burden); Richard v. Dougherty (In re Dougherty), 179 B.R. 316, 322 (Bankr. M.D. Fla. 1995) ("In other words, the debtor himself must have obtained the money or property and he must have received it from the claimant.").

Frandsen Bank loaned money to NCAB, not Debtor individually.  The debt that Aslakson seeks to except from discharge arose as a result of a guaranty Aslakson executed in favor of the bank, which served as security for NCAB's debt to the bank. There is no evidence that proceeds from the Frandsen Bank loan were transferred to Debtor.[13]  Rather, the loan proceeds were transferred to NCAB.

---

[13] Although Aslakson offered evidence that Debtor wrote checks from the NCAB account for personal expenses during the months of November 2005 to November 2006, the sum of money Debtor withdrew did not exceed the $3,000/month he was entitled to withdraw as a salary pursuant to the terms of the Partnership Agreement. Further, Aslakson did not offer evidence that loan proceeds, which were reportedly disbursed in late 2001/early 2002 and again in 2004, were used by Debtor for personal expenses.

17

Accordingly, Aslakson has not made the requisite threshold showing that Debtor obtained money or property from Aslakson by fraud.  His claim under section 523(a)(2)(A) is dismissed.

Even if Aslakson had offered evidence sufficient to meet the threshold showing required under section 523(a)(2)(A), the record does not include evidence sufficient to establish several of the other elements of this claim.  The heart of Aslakson's claim is Debtor's failure to disclose that he was selling vehicles without immediately remitting the proceeds to Frandsen Bank to pay NCAB's debt to the bank.  Aslakson's understanding of the floor plan loan arrangement was that Frandsen Bank held titles to the vehicles purchased with the floor plan line of credit until it received proceeds from the sale of a specific vehicle, at which time it would release the title to the vehicle sold.  Apparently, Aslakson assumed that the bank and/or Debtor routinely reconciled the inventory list with the sale documentation to ensure that the proceeds from every NCAB sale were applied to the debt owed against the vehicle.  Based on the length of time between August 2005/fall 2005 (when Debtor admittedly began selling vehicles off the floor plan) and the date the bank first inquired about inventory discrepancies in August 2006, it appears that reconciliation of inventory with debt against the inventory did not occur as frequently as Aslakson assumed.

Contrary to Aslakson's understanding, Debtor testified that the floor plan line of credit did not require that NCAB notify the bank and remit the proceeds from each sale of a vehicle immediately after sale of a vehicle listed on the floor plan inventory.  Debtor offered no detail or documentation regarding any grace period to notify the bank or payoff the debt against the vehicle purchased with funds from the line of credit.

18

Neither party offered the loan documents and security agreements between Frandsen Bank and NCAB as evidence at trial, leaving the Court with an incomplete understanding of NCAB's obligations to the bank. More importantly, there is no evidence that the Partnership Agreement or other agreement, policy or practice established Debtor's duty as the Managing Partner of NCAB to immediately remit sale proceeds from each and every vehicle to Frandsen Bank to reduce the outstanding debt or to inform Aslakson if he failed to do so. To the contrary, the management of NCAB's financial affairs was the type of responsibility left to the discretion of Debtor as Managing Partner.

Without evidence of such an obligation or an appropriate grace period between the vehicle sale and loan payment, the Court is left without information sufficient to determine when the failure to remit sale proceeds to the bank (or to advise Aslakson of such failure) turned from common business practice to fraud. Likewise, it is impossible to determine the loss proximately resulting from the alleged omission without knowing at what point Debtor's failure to advise Aslakson that he had not remitted sale proceeds to the bank amounted to a fraudulent omission.[14]  Accordingly, the Court finds Aslakson

---

[14] Aslakson suggests that bank records showing that Debtor routinely withdrew cash from NCAB's account or wrote personal checks for expenses unrelated to NCAB's business is evidence of Debtor's fraudulent intent. The Court is not persuaded that this evidence is sufficient to meet his burden under section 523(a)(2)(A) for several reasons. First, Aslakson admitted that there was no evidence that profits from the sale of vehicles found their way to Debtor's pocket. Second, under the Partnership Agreement, Debtor was entitled to withdraw $3,000/month as a salary. The sum of money Debtor withdrew or spent for personal expenses does not exceed this sum. While there is no doubt that it was a more prudent business practice to write a check for salary from the business account rather than write checks for personal expenses from NCAB's account, given the small sum used for personal purposes, this evidence is insufficient to establish fraudulent intent. Third, Debtor's use of the business account for personal expenses,

19

did not meet his burden of showing that Debtor's failure to advise him he was selling

cars off the floor plan was a fraudulent omission/"representation" under section

523(a)(2)(A) because Debtor did not have an ongoing duty under this subsection to

advise Aslakson that NCAB's equity in the inventory was losing value.  See In re Juve,

455 B.R. at 896 ("The Debtor did not have an ongoing duty under

§ 523(a)(2)(A) to advise the Creditor regarding whether his interest in the vehicles was

protected and the loss of equity in the vehicles would not support a determination of

fraud under § 523(a)(2)(A).").

In addition, the Court finds that there is insufficient evidence to show that

Aslakson justifiably relied on Debtor's alleged fraudulent omissions.  This finding is

based on two reasons.  First, Aslakson could not have justifiably relied on the alleged

fraudulent omissions in signing the guaranties to Frandsen Bank in late 2001/early 2002

and 2004--which serve as the basis for the debt he seeks to except from discharge--

because the fraudulent omissions began in August 2005, more than a year after the last

guaranty he executed.  See In re Unterreiner, 459 B.R. at 730 (finding that creditor

could not have reasonably relied on misrepresentations in a security agreement which

was granted by debtor long after the creditor signed a loan guaranty which served as

the basis of the debt the creditor sought to except from discharge).

Second, Aslakson knew about the gradual demise of NCAB's business and

understood that under the terms of the guaranties he signed, he would be liable to the

---

without more, does not show that he was intentionally withholding information from
Aslakson about selling vehicles off the floor plan.

20

bank for sums owed to it if NCAB failed.  Specifically, Aslakson knew NCAB was not profitable after the first year in business, but continued to invest in the business and support Debtor, who was his son-in-law at the time.  Other than a dividend after the first six months of operating, all the information provided to Aslakson indicated that NCAB was losing money.  The information Aslakson received included a business plan for NCAB, which Debtor prepared every year and provided to Aslakson.  Aslakson also received financial statements prepared by Vetter, which showed substantial business losses.  Although he did not know whether there was a profit earned from each vehicle sold, he understood that NCAB incurred expenses other than the cost to purchase the vehicles, such as insurance, rent and vehicle transportation.  Aslakson conceded he had no evidence that profits found their way to Debtor's pocket.

In addition to financial statements, Aslakson also received information from Debtor regarding the status of NCAB's sales.  Because Aslakson's trucking business was located at the same place as NCAB, Aslakson and Debtor saw each other on almost a daily basis, and the men regularly discussed how the business was doing. Aslakson's access to the NCAB financial information and business records was not restricted by Debtor.

Finally, during a partnership meeting in November 2005, Aslakson learned that NCAB did not have funds sufficient to make the interest payment to Frandsen Bank. This meeting occurred shortly after Debtor began selling vehicles off the floor plan. Although there were obvious warning signs about the viability of NCAB, Aslakson agreed to help his son-in-law by making NCAB's interest payment of over $8,000.00 with funds from a personal account.

21

In closing argument, Aslakson claimed that inventory figures provided on the 2005 financial statements (which he claims were supplied by Debtor) were intentionally misleading because they provided the floor plan debt balance rather than the actual inventory.  Aslakson also suggests that he relied on these inventory figures and, had they been accurate, he would have known about the depletion of the inventory and closed the business sooner.  Aslakson's argument is not supported by the evidence offered at trial.

Aslakson offered no evidence that the financial statements prepared from 2002 to August 2005 (before Debtor began to sell vehicles off the floor plan), were inaccurate. As to those that were prepared after August 2005, NCAB's accountant testified that he prepared the 2005 and 2006 financial statements some time <u>after</u> NCAB stopped doing business, and could not recall if Debtor or Aslakson gave him the numbers used in these financial statements.  Consequently, Aslakson could not have relied on omissions allegedly withheld from inventory figures on the 2005 financial statements because the financial statements were not prepared until after Debtor admitted to selling cars off the floor plan and after NCAB was terminated.

To meet his burden of showing justifiable reliance under section 523(a)(2)(A), which is a lesser standard than reasonable reliance,[15] a creditor may rely on a representation of fact even though he might have discovered the falsity of the representation if he had investigated the matter.  <u>Islamov v. Ungar</u> (<u>In re Ungar</u>), 633 F.3d 675, 679 (8th Cir. 2011) (citing <u>Field v. Mans</u>, 516 U.S. 59, 70 (1995)).  However,

---

[15] <u>Reuter v. Cutcliff</u> (<u>In re Reuter</u>), 443 B.R. 427, 435 (B.A.P. 8th Cir. 2011).

creditors may not "turn a blind eye where a patent falsity could be determined by a cursory examination or investigation." Id. (quoting Field, 516 U.S. at 71) (internal quotations and citations omitted)).

Here, it is apparent the Partnership Agreement not only granted Debtor a great deal of discretion, it gave him the benefit of the doubt regarding the exercise of this discretion--which Aslakson did not seek to restrict until August 2006. Aslakson knew that NCAB was not financially successful, that the business losses grew steadily and that stockholders' equity diminished from -$40,914.92 in 2002 to -$163,113.63 in 2006. Access to NCAB's inventory and business records was immediately available to Aslakson because NCAB was located in the same place as Aslakson's trucking business, and his access to the records was not restricted. Although the question of justifiable reliance is a close one, given the broad discretion granted to Debtor under the Partnership Agreement and the regular disclosure of financial information by Debtor and Vetter, and without evidence of a duty on the part of Debtor to disclose that he was selling vehicles without immediately remitting the proceeds to the bank, the Court finds that there is not sufficient evidence to show justifiable reliance. Accordingly, Asklakson's claim under section 523(a)(2)(A) fails for these reasons as well.

> **B.    11 U.S.C. § 523(a)(4)**

In his Complaint, Aslakson also seeks an order excepting the debt Aslakson claims Debtor owes to him under section 523(a)(4). Specifically, Aslakson alleges Debtor's conduct constitutes fraud or defalcation while acting in a fiduciary capacity. To prevent the discharge of the debt under section 523(a)(4), Aslakson must establish two elements: (1) there was a fiduciary relationship between Aslakson and Debtor; and (2)

23

Debtor committed fraud or defalcation in the course of that fiduciary relationship.  See

Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001);

Helena Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263, 301 (Bankr. E.D. Ark.

2010).

Whether the relationship is a fiduciary relationship within the meaning of 11

U.S.C. § 523(a)(4) is an issue of federal law.  Tudor Oaks Ltd. P'ship v. Cochrane (In re

Cochrane), 124 F.3d 978, 984 (8th Cir. 1997).  The fiduciary relationship required under

this section is more narrowly defined than that under the general common law.  In re

Shahrokhi, 266 B.R. at 707.  "[T]he broad, general definition of fiduciary–a relationship

involving confidence, trust and good faith–is inapplicable in the dischargeability context."

Hunter v. Philpott, 373 F.3d 873, 876 (8th Cir. 2004) (quoting Cal-Micro, Inc. v. Cantrell

(In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003)); Brown v. Heister (In re Heister),

290 B.R. 665, 673 (Bankr. N.D. Iowa 2003) (noting that "fiduciary" as that term is used

in section 523(a)(4) "does not extend to the more general class of fiduciaries such as

agents, . . .  partners.") (citation omitted)).  Rather, to meet the narrow definition

applicable under section 523(a)(4), the fiduciary relationship between the debtor and the

creditor must arise from an express or technical trust "'that was imposed before and

without reference to the wrongdoing that caused the debt.'" In re Cochrane, 124 F.3d at

984 (citation omitted).

A technical trust is one imposed by statute or common law.[16]  "An express trust is created by a direct, positive, and objectively-manifested act under contract, or under an instrument such as a deed or will."  Chicago Title Ins. Co. v. Moe (In re Moe), 2006 WL 4711887 at *6 (Bankr. D. Minn. 2006) (citation omitted).  Typically, the parties to an express trust prepare a declaration of a trust, define a trust res and outline specific duties and responsibilities of the trustee.[17]  However, "[i]t is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes."  Barclays Am./Bus. Credit v. Long (In re Long), 774 F.2d 875, 878-79 (8th Cir. 1985).

Neither a constructive trust imposed by law because of the trustee's malfeasance nor mere contractual relationships are cognizable under section 523(a)(4).  Hunter, 373 F.3d at 876; In re Long, 774 F.2d at 878-879; In re Shahrokhi, 266 B.R. at 708.

---

[16] Reshetar Sys., Inc. v. Thompson (In re Thompson), 458 B.R. 504, 508 (B.A.P. 8th Cir. 2011) (citing E. Armata, Inc. v. Parra (In re Parra), 412 B.R. 99, 104 (Bankr. E.D.N.Y. 2009) and A.J. Rinella & Co. v. Bartlett (In re Bartlett), 397 B.R. 610, 619 (Bankr. D. Mass. 2008)); Chicago Title Ins. Co. v. Moe (In re Moe), 2006 WL 4711887 at *6 (Bankr. D. Minn. 2006) (citing Stowe v. Bologna (In re Bologna), 206 B.R. 628, 632 (Bankr. D. Mass.1997)).

[17] See In re Thompson, 458 B.R. at 508 ("An express trust is one created with the settlor's express intent, usu[ally] declared in writing." (citing Black's Law Dictionary 1650 (9th ed. 2009)); Werner v. Hofmann (In re Hofmann), 144 B.R. 459, 463 (Bankr. D.N.D. 1992) ("Generally, an express trust is created by an agreement between two parties to impose a trust relationship. The typical characteristics of an express trust generally include an explicit declaration of a trust with a trust res, and an intent to create a trust relationship." (citations omitted)); In re Richmond, 429 B.R. at 301 ("'Unless the parties intended a trust, defined a trust res, and gave specific duties regarding the trust funds or unless a statute imposes a trust, the fiduciary relationship contemplated in § 523(a)(4) does not extend to financing arrangements or security agreements.'" (citations omitted)).

Aslakson did not assert in trial briefs or in closing argument that an express or technical trust established a fiduciary relationship between Debtor and Aslakson. Instead, it appears that both Aslakson and Debtor assumed the broad, general definition of fiduciary--a relationship involving confidence, trust and good faith--created a fiduciary relationship and imposed duties enforceable in this bankruptcy case.  As noted above, this type of fiduciary relationship is inapplicable in the dischargeability context.  Hunter, 373 F.3d at 876; Arvest Mortg. Co., v. Nail (In re Nail), 446 B.R. 292, 300 (B.A.P. 8th Cir. 2011).

However, in closing argument Aslakson referred to the Partnership Agreement as evidence that a fiduciary relationship was created.  Assuming this reference may be read as an assertion that the Partnership Agreement included a provision creating an express trust sufficient to establish a fiduciary relationship between Debtor and Aslakson, this argument is rejected as well.

The Partnership Agreement did not include a provision requiring that Debtor hold sale proceeds in trust or immediately remit the proceeds from the sale of vehicles to the bank.  Further, the agreement did not require that Debtor inform Aslakson of any failure to apply sale proceeds to the debt owed to the bank or otherwise comply with a security agreement or any other financial commitment incurred by the partnership.  To the contrary, the management of NCAB's financial affairs was the type of responsibility left to the discretion of Debtor as Managing Partner.  Under the Partnership Agreement, the Managing Partner was granted authority to provide such services to the operation of the

26

partnership's business as he deemed "proper and necessary."[18]  Pl.'s Exh. 1 at ¶¶ 8b,

10.  Both parties testified that the day-to-day management of NCAB was left to Debtor.

The Partnership Agreement not only granted the Managing Partner a great deal

of discretion, it gave him the benefit of the doubt regarding the exercise of this

discretion.  The agreement provided:

> The Managing Partner shall not be liable to the Partnership or to any Partner
> for any mistake, error in judgment, act or omission believed in good faith to
> be within the scope of authority conferred by this Agreement.  The Managing
> Partner shall be liable only for acts or omissions involving intentional
> wrongdoing.

Pl.'s Exh. 1 at  ¶8e.

Accordingly, the Court finds that a fiduciary relationship between Debtor and

Aslakson did not arise from an express trust created in the Partnership Agreement.  Any

liability for intentional wrongdoing resulting from Debtor's conduct and imposed by the

"intentional wrongdoing" language of the Partnership Agreement may arguably support

the imposition of a constructive trust under common law, but it does not establish that

the debt is excepted from discharge under section 523(a)(4).  The fiduciary relationship

contemplated by section 523(a)(4) must arise from an express or technical trust "'that

was imposed *before* and *without reference to* the wrongdoing that caused the debt.'"  In

re Cochrane, 124 F.3d at 984 (citation omitted) (emphasis added); Hunter, 373 F.3d at

876; In re Long, 774 F.2d at 878.  The trustee of a constructive trust imposed because

of the trustee's wrongful conduct is not a fiduciary within the meaning of section

---

[18] Under the Partnership Agreement, the Managing Partner was also required to
keep and maintain complete records of each and every transaction of the partnership
and deposit the funds of the partnership in a designated bank account.  Pl.'s Exh. 1 at
¶¶ 8c, 8d.  There was no evidence that Debtor failed to comply with these requirements.

523(a)(4).  In re Hunter, 373 F.3d at 875-76 (referring to a constructive trust as one "imposed by law because of the trustee's malfeasance"); In re Long, 774 F.2d at 878 (referring to a constructive trustee as one "designated as such because of misconduct"). Therefore, even if Aslakson had established that Debtor was liable for intentional wrongdoing under the Partnership Agreement, this would not prove his claim under section 523(a)(4).

Since the Partnership Agreement did not create an express trust that imposed a fiduciary relationship between Debtor and Aslakson cognizable under section 523(a)(4), and since Aslakson did not assert that a fiduciary relationship arose from a technical trust imposed by statute or common law, his claim and cause of action under section 523(a)(4) fails.

## CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Plaintiff Terrance Paul Aslakson's Motion to Admit Evidence is **GRANTED**.  Aslakson failed to prove his claims under section 523(a)(2) and (4) by a preponderance of the evidence.  His claims and causes of action are **DISMISSED**.  Defendant/Debtor's Motion for Directed Verdict is **MOOT**.

JUDGMENT MAY BE ENTERED IN FAVOR OF DEFENDANT.

Dated this 18th day of April, 2012.

 /s/ Shon Hastings
SHON HASTINGS, Judge
United States Bankruptcy Court